IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                 Civ. No. 08-0556 JP/ACT

C.I.P. INC., a New Mexico Corporation,

    Defendant.

### MEMORANDUM OPINION AND ORDER

On April 27, 2009, Defendant C.I.P. Inc. ("CIP") filed Defendant C.I.P. Inc.'s Motion for Summary Judgment and Memorandum in Support Thereof (Doc. No. 39). CIP moves for summary judgment on all four of Plaintiff United States' claims on the basis that there is insufficient evidence of causation, an element common to the four claims. However, the United States has raised a genuine issue of material fact on causation, and CIP is not entitled to judgment as a matter of law. CIP's motion should be denied.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'material' fact is one 'that might affect the outcome of the suit under the governing law,' and a 'genuine' issue is one for which 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). In determining whether there is a genuine issue of material fact, the Court "must consider the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005) (citation omitted).

When, as here, "the moving party does not have the ultimate burden of persuasion at trial, it [still] has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 980 (10th Cir. 2002) (citation omitted). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Id.* (citation omitted).

"Once this burden is met, Rule 56(e) requires the non-moving party to set forth specific facts showing there is a genuine issue for trial." *Id.* (citation omitted). "[T]he non-moving party must present more than a mere scintilla of evidence"; in other words, the non-moving party must present "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Hom v. Squire*, 81 F.3d 969, 973-74 (10th Cir. 1996) (citing *Anderson*, 477 U.S. at 249, 252). "In doing so, the non-moving party must 'make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Pinkerton v. Colo. Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986)).

## Factual Background

In the spring of 2002, conditions were dry in the Santa Fe National Forest ("Forest"). To reduce the threat of fire, on May 8, 2002 the United States Forest Service ("Forest Service") issued a closure order for the Forest. The order prohibited all persons from entering the Forest, including its roads and trails, but allowed landowners and lessees to use forest roads for entrance to or exit from a holding. The order also prohibited use of any "internal or external combustion engine without a spark arresting device." These prohibitions remained in effect through June 17, 2002, the day the events that are the subject of this lawsuit took place.

During that spring, Benson-Montin-Greer Drilling Corp. ("BMG") operated an oil well in the Forest under a lease from the United States. At the well site, BMG had constructed a work yard. The BMG crew at the yard included Ben Gonzales, the foreman, James "Pete" Schmidt, Dillon Gibson, Paul Sturdevant, Dickie Cordova, and Ernie Martinez. Inside the yard were "frac" tanks that could hold water, oil, or other fluids. Forest Road 313, an unpaved road, gave BMG access to the yard. As a lessee, BMG could use the road under the terms of the closure order, a copy of which was posted on a bulletin board at the work yard. During the closure, BMG prohibited the crew from smoking except in the work yard, a prohibition that was enforced by Gonzales.

Defendant CIP, a New Mexico corporation solely owned by Carl Padilla, was a contractor for BMG. CIP was responsible for providing equipment in support of the drilling operations. At the work yard, CIP employee Garner "Bronc" Halbert operated a "Gallion Hydrocrane," a make of mobile crane. The crane was an older, slow machine,

capable of a top speed of at most 5 mph. The crane's exhaust pipe was on the left side of the crane, at least six feet above the ground. It was not equipped with a spark arrester, but there was a muffler on the exhaust pipe. Up until June 17, 2002, the crane had only been used inside the work yard, primarily to move the frac tanks around so that C.I.P. employees could do welding on the tanks.

    At about ten o'clock in the morning of June 17, the BMG crew wanted to service an oil pipeline compressor, which was two or three miles west of the yard along the forest road. To do so, the crew needed to lift a heavy cylinder off the compressor. Gonzales telephoned Padilla to ask if the crane could be used. Padilla gave his permission, and Halbert drove the crane to the compressor site. Normally, the crane would have been followed by a water truck spraying water on the road. However, on June 17 the water truck was unavailable, so Martinez drove a pickup truck pulling a steam-cleaning trailer (which could also spray cold water) to the site.

    At about four o'clock in the afternoon, the crew had finished servicing the compressor. Schmidt, Sturdevant, Cordova, and Gibson returned to the work yard in two pickup trucks. They did not see any other vehicles on the road. Some time after they arrived at the yard, though, they saw the slower crane returning along the road. However, Martinez was not following with the steam cleaner; instead, he had been the first one to return to the yard, ahead of the rest of the crew. The crew started to give Martinez "a little bit of heck" for his haste. Then they saw the smoke.

    The smoke was rising from where the crane had been. Schmidt, Sturdevant, Cordova, and Gibson piled into two pickup trucks and raced to the fire, which was between one-quarter and one-half mile down the road to the west. On the north side of the road, tall grass and a few trees were burning. The crew tried to create a fire line to

contain the fire, but the wind picked up and blew the fire back across the road to the south. Gonzales arrived at the scene and moved the pickup trucks to a safer location. A rake that Sturdevant had left on the north side of the road was burned, and the fire spread to the treetops.

Realizing that the fire was more than they could handle, the crew retreated to the yard. On the way, they met Forest Service firefighters coming to fight the fire. A Forest Service fire lookout had reported the fire at 4:30 PM. Before the firefighters got the fire under control, it burned 491 acres, only one acre of which was south of the road. In putting out the fire, the Forest Service expended at least $800,000.00.

At one o'clock in the morning on June 18, 2002, John Dickenson, a Forest Service Law Enforcement Officer at the time, arrived at the fire to investigate its cause. Dickenson first interviewed Forest Service firefighters. He then cordoned off an area where he believed the fire had started. At 6 AM, Dickenson began to search the area, and at 10 AM he interviewed Gonzales, Sturdevant, and Schmidt. Dickenson looked at the exhaust systems on the pickup trucks, which appeared to be in good shape. After inspecting the crane, though, Dickenson took custody of it by flagging it and chaining its steering wheel. At some point, Dickenson noted the burned rake; he also found all-terrain vehicle ("ATV") tracks in the burned area. Dickenson did not, however, attempt to interview any of the nearby residents to find out if they had used an ATV the previous day. In Dickenson's opinion, the tracks were several days old; furthermore, the witnesses had not reported seeing any ATVs. Later, Dickenson asked for help to make a thorough search for the possible causes of the fire. At 4:30 PM, Darwin Vallo, another Forest Service Law Enforcement Officer, arrived.

Based on Dickenson's inspection, he had narrowed the possible point of origin of

the fire to an area about 10 feet by 30 feet in size. Vallo and Dickenson looked at the area using a magnifying glass. They did not find any evidence that the fire was started by a smoker, by a campfire, or by fireworks. Using magnets, they found two metal particles coated with carbon about seven feet from the road. In Dickenson's opinion, the particles were the cause of the fire.

Two weeks later, on July 2, 2002, Dickenson returned to the yard to meet with Padilla. Padilla removed the muffler from the crane and gave it to Dickenson. In return, Dickenson released custody of the crane to Padilla. The muffler was sent to Ralph Gonzales, a Forest Service mechanical engineer, for testing. Dickenson also sent the two metal particles, because he did not know whether there might be a test that could determine if the particles came from the muffler. Gonzales tested the muffler and found it ineffective as a spark arrester. He did not test the particles. Based in part on Gonzales' report, Dickenson concluded that the crane was the likely source of the particles.

On June 11, 2008, the United States filed its Complaint (Doc. No. 1), alleging the fire was caused by CIP's crane. On November 15, 2008, two experts for CIP, Don Naylor and Jack Keller, visited the scene. In Keller's opinion, the fire started on the south side of the road. Gonzales, who stopped by the scene the day of the experts' visit, did not disagree with him. Gonzales recalled that when he had reached the fire, it had been burning on both sides of the road. Using a metallic rake, Keller also found metallic particles on both sides of the road.

In Naylor's opinion, Dickenson's investigation was not thorough. Naylor believed that other possible causes of the fire, such as smoking, sunlight magnified through a discarded bottle, and catalytic converters on vehicles, had not been eliminated by Dickenson. Naylor also noted that Dickenson was unable to prove that the particles

came from the crane. In Naylor's view, after the particles traveled at least seven feet from the road, they would not have remained hot enough to start a fire.

## Analysis

The United States brings four claims. First, it alleges CIP breached its duty of ordinary care by negligently maintaining the crane, a breach that caused the Fire. (Compl. ¶ 15.) Second, the United States alleges CIP committed negligence *per se* by violating Forest Service regulations that prohibit "causing timber, trees, slash, brush or grass to burn except as authorized by permit." (*Id.* ¶ 17 (citing 36 C.F.R. § 261.5(c)).) Third, the United States alleges CIP violated a New Mexico statute that prohibits "any person" from setting "any woods" on fire "so as thereby to occasion any damage to any other person." (*Id.* ¶ 18 (citing N.M. Stat. § 30-32-4).) Fourth, the United States alleges CIP operated the crane "without a spark arresting device properly installed and such failure proximately caused the [] [f]ire." (*Id.* ¶ 20.)

In its motion, CIP argues that the United States has insufficient evidence to carry its burden at trial on one element–causation–common to all four claims. In CIP's view, in the absence of a direct link between the particles and the muffler–such as a scientific test matching the composition of the two–it is only speculation that the crane caused the fire. To bolster its argument, CIP notes other possible causes: smoking, the pickup trucks, other vehicles.

In response, the United States argues that its proof of causation in the record, taken as a whole, is sufficient for a reasonable trier of fact to find that the crane caused the Fire. The United States first recounts the evidence Dickenson relied on in making his determination that the particles caused the fire. It then points out that CIP's experts examined the scene over six years later, a lapse of time that could cast doubt on their

conclusions. The United States then enumerates the evidence, particles aside, tending to show the crane caused the fire: 1) the crane was old; 2) its muffler was ineffective at preventing sparks; 3) heavy equipment has been known to start forest fires by sparking; 4) the fire started the first time the crane was used outside the yard; 5) conditions were dry; 6) the fire started in close proximity in time and space to the crane; 7) there is evidence and testimony corroborating Dickenson's opinion as to the point of origin of the fire; 8) Dickenson and Vallo eliminated other causes at the point of origin; 9) the crew was ordered not to smoke; 10) there is testimony that no one smoked during the trip back to the yard; 11) the pickup trucks had intact exhaust systems; 12) no other vehicles were seen in the area immediately before the fire; and 13) the ATV tracks were several days old.

In its reply, CIP repeatedly–and incorrectly–asserts that the United States' burden at this stage is proof by a preponderance of the evidence. (*See* Def.'s Reply at 3-4.) Instead, the United States "must proffer facts such that a reasonable jury could find in [its] favor." *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009). In other words, at the summary judgment stage the Court does not act as a finder of fact, deciding whether the United States has met its ultimate burden of proof by a preponderance of the evidence. Instead, the Court determines, based on the evidence in the record, whether a *reasonable* finder of fact *could* find that the United States had met its burden of proof by a preponderance of the evidence.

In addition, CIP asserts that the United States must prove by a preponderance of the evidence two facts: 1) the particles came from the crane, and 2) the particles started the fire. This is again incorrect, and not just because CIP misstates the burden at this stage. At summary judgment the issue is whether a reasonable fact finder, *taking the*

*record as a whole*, could find that the United States has met its burden *on an element of its claim*. Causation is the disputed element of the United States' claims. The origin and role of the particles are merely facts that have relevance to but do not dispose of the causation element.

Taking the record as a whole, a reasonable fact-finder could find that the United States has met its burden on the element of causation. When viewed in a light most favorable to the United States, the evidence shows that the fire started on the north side of the road, the side the crane's exhaust faced as the crane returned eastward to the yard. The crane's exhaust was not equipped with a spark arrester and its muffler was ineffective at preventing sparks. Finally, the fire started at approximately the time the crane passed by. This suffices to meet the United States' burden, particles or no particles. Furthermore, when viewed in a light most favorable to the United States, the evidence rules out the other causes suggested by CIP.

CIP faults Dickenson for not establishing a scientific link between the particles and the muffler. However, nothing in the record shows there is a scientific test that could definitively determine whether the carbon particles came from the muffler. CIP's argument is based on Dickenson's testimony that he *thought* there might be such a test. Even were there such a test, and it had been performed, and it had conclusively shown the particles *did not* come from the crane, the United States' evidence, taken as a whole, would still suffice to defeat CIP's motion, because a reasonable fact-finder could disregard the particle evidence–by inferring that the "guilty" particles had been blown away or destroyed–and find for the United States based on the evidence as a whole.

CIP analogizes this situation to one in which there is "a ballistics analysis wherein the offending bullet cannot be traced to the weapon arguably linked to a crime." (Def.'s

Mot. Summ. J. at 10-11.) The Court would further analogize the situation (viewing it, of course, in a light most favorable to the United States) to one in which, despite an inconclusive ballistics analysis, a suspect is found alone, armed with a gun, and in close proximity to a gunshot victim, shortly after shots were heard. *Cf., e.g., Stamper v. Muncie*, 944 F.2d 170, 174-75 (4th Cir. 1991) (evidence taken as a whole, including proximity of defendant to victims in time and space, sufficient to uphold jury verdict of murder even though ballistics evidence was inconclusive as to whether defendant's pistol was in fact the murder weapon). CIP's motion should be denied.

**IT IS THEREFORE ORDERED THAT:**

Defendant C.I.P. Inc.'s Motion for Summary Judgment and Memorandum in Support Thereof (Doc. No. 39) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE